AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

**FILED**

APR 19 2024

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| In the Matter of the Search of<br>**(1) Apple iPhone with black pelican case, (1) Samsung Android phone with black speck case S/N: R58W417EKKX, (1) Apple iPhone mini with black otter case, Currently Stored at Homeland Security Investigations Tulsa, OK** | )<br>)<br>)<br>)<br>) |

Case No. 24-MJ-289-MTS

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **18 U.S.C. § 1343** | **Wire Fraud** |
| **18 U.S.C. § 1344** | **Bank Fraud** |

The application is based on these facts:
   **See Affidavit of TFO Andrew Titsworth, HSI attached hereto.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Andrew Titsworth*
*Applicant's signature*

**TFO Andrew Titsworth, HSI**
*Printed name and title*

Subscribed and sworn to by phone.

Date: 4-19-2024

City and state:  Tulsa, Oklahoma

*Judge's signature*

U.S. Magistrate Judge Mark T. Steele
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **In the Matter of the Search of (1) Apple iPhone with black pelican case, (1) Samsung Android phone with black speck case S/N: R58W417EKKX, (1) Apple iPhone mini with black otter case, Currently Stored at Homeland Security Investigations Tulsa, OK** | **Case No. _____** <br><br> **FILED UNDER SEAL** |

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Andrew Titsworth, being first duly sworn under oath, depose and state:

#### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I am a Task Force Officer (TFO) with Homeland Security Investigations (HSI), within the Department of Homeland Security (DHS), assigned to the Tulsa, Oklahoma Resident Agent in

Charge Office. I have been so assigned since May 2019. As part of my duties as an HSI TFO, I investigate criminal violations relating to smuggling goods into the United States, wire fraud, fraud schemes, and various financial crimes. Prior to being assigned to the HSI Task Force, I have been a Deputy Sheriff at the Tulsa County Sheriff's Office (TCSO) since December 2010. I completed the HSI TFO training program in Lorton, Virginia, where I received training relative to intellectual property rights, conspiracy investigations, child pornography investigations, general smuggling investigations, smuggling of arms and strategic technology, and various surveillance and investigative techniques.

3. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

4. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of **18 United States Code § 1343 (Wire Fraud) and 18 United States Code 1344 (Bank Fraud)** will be located in

2

the electronically stored information described in Attachment B and is recorded on the devices described in Attachment A.

### Identification of the Device to be Examined

5. The property to be searched is a (1) Apple iPhone with black pelican case, (1) Samsung Android phone with black speck case, serial number R58W417EKKX and (1) Apple iPhone mini with black otter case, hereinafter the "Devices." The Devices are currently located at Homeland Security Investigations (HSI) Seized Property Room, located in Tulsa, OK.[1]

6. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

### Probable Cause

7. In February 2024, Homeland Security Investigations (HSI) Tulsa was requested to assist the Tulsa County Sheriff's Office (TCSO) with a criminal investigation of a group of conspirators called Deep East Texas Sound and Vision (DETSAV). The Oklahoma Attorney General in coordination with TCSO are currently pursuing charges against DETSAV who are violating the Oklahoma Racketeering Influenced and Corrupt Organization Act (RICO Act), as well as other

---

[1] The two Apple iPhones do not have exterior serial numbers.

state crimes. The scam involved multiple co-conspirators selling inferior television projectors that were packaged in boxes displaying descriptions of a much higher quality than the truth. The co-conspirators would let the victims read the packaging so that they would infer the product was as advertised. The victim could also scan a QR code on the side of the projector boxes to access websites that purported to show the MSRP and features of the projector. The co-conspirators would then sell the inferior projector at price the co-conspirators represented as cheaper than if they bought it elsewhere. In the Northern District of Oklahoma, at least ten individuals have fallen victim to the scam.

8. Evidence relating to transactions of this scam reveals likely violations of 18 United States Code § 1343 (Wire Fraud) and 18 United States Code 1344 (Bank Fraud) wherein the conspirators have made material misrepresentations orally and/or through the use of websites reflecting false information to obtain money or property by wire transaction or bank check.

9. One conspirator, Rodney CLIFTON, was arrested in late 2022 in the state of Texas on unrelated Organized Crime charges. The League City Police Department, in Texas obtained a Search Warrant for a cellular phone in CLIFTON's possession at the time of his arrest. Because they found evidence of crimes committed in Oklahoma, the League City Police Department gave a copy of the forensic download of that cellular device to TCSO Deputy Hirsch. Deputy Hirsch's review of that digital download revealed evidence of several crimes, including fraud and violations of the Oklahoma RICO Act, being committed in Tulsa County. Specifically, Deputy

4

Hirsch found screenshots of emails that were sent to CLIFTON's phone by fellow conspirators. These screenshots showed emails between various members of the conspiracy discussing the low-end specifications of the projectors. They also showed the conspirators discussing the representations made on the packaging of the projectors.

10. Through the 2022 League City Police Department search warrant for the cellular phone in CLIFTON's possession, a victim was identified located in the Tulsa area. Deputy Hirsch located the following text message in CLIFTON's phone dated February 3, 2022, which identified Robert Ward as a victim.

> "Hey Rodney, I purchased the McClaron 8K projector and screen from you in Tulsa about a week ago. I have a friend of mine that is going to purchase it from me as like I said I didn't need it, you said your company will warrantee for 5 years if I remember correctly.  Is that correct sir? Rob Ward"

11. On January 11, 2023, TCSO Deputy Hirsch met with Robert Ward. Ward stated he was in the parking lot of the Hideaway Pizza at 7549 S. Olympia Ave, Tulsa, OK 74132, in his black 2020 Ford F250 pickup, when he was approached by two White Males in a newer model Chevrolet Suburban. Ward stated the driver was younger, in his 40's and named "Rod", and the passenger was older, possibly in his 50's, but did not exit the vehicle or speak much. Ward stated Clifton told him they were in town from Texas on a job installing projectors and screens at a business in Broken Arrow. Ward stated Clifton was obviously the boss and did all the talking. Ward stated Clifton told him the client for the job didn't need or want some of the projectors, so he was now trying to sell them at a discounted price. Ward stated

Clifton was "clean cut" and looked the part. Ward stated Clifton showed him a business card to gain his confidence about his identity. Ward stated Clifton showed him four or five projectors and screens in the back of their vehicle and told him they were worth $9,000 each. Ward stated Clifton showed him a website showing the price of the projectors at $9,000. Ward stated Clifton told him if he didn't like it, he could resell it for a large profit. Ward stated Clifton originally asked for $3,000, but then settled on $2,500 for one projector and one screen. Ward stated he wrote Clifton a check in the Hideaway parking lot and Clifton wrote him a receipt for the projectors. Ward stated Clifton wrote his name and phone number on the back of the receipt.

12. Ward stated Clifton drove to the bank who issued the check, Security Bank at 10727 E. 51 Street, Tulsa, OK 74146, and immediately cashed the check. Ward surrendered the projector, screen, and receipt to Deputy Hirsch at the time he gave his statement, and those items were booked into the Tulsa County Property Room as evidence.

13. Beginning in approximately the summer of 2023 to early 2024, the O'Fallon Police Department (OPD) located in O'Fallon Missouri began receiving reports of victims of the projector scam. Specifically, on February 28, 2024, the OPD took a report from victim Brennan Lograsso who stated that on February 28, 2024, at approximately 0830 hours he was leaving the parking lot of a Home Depot located at 1525 Highway K, O'Fallon, MO, 63366. The victim stated as he was leaving a newer model, white Ford Expedition with Texas plates (TFN1340) approached him. The

victim stated a male named "Charlie" exited the vehicle and offered to sell him a projector and projector screen. The victim advised "Charlie" told him he was in town to deliver projectors for Buffalo Wild Wings but had several extras that he wanted to sell. He identified the projectors as being the same projectors used at Buffalo Wild Wings and having the following specifications: Ennea Projector, Model: E8K-8900, 8K Ultra HD 7680x4320, Cost: $11,200.00, 8 Simultaneous Display screens, Cystal clear, Used for Gaming systems/golf simulators.

14. The victim stated a QR code on the projector's box took him to the following link, Ennaprojectors.com/e8k-8900. The link provided the following description of the above stated projector: Price: $11,999.99 SPECIAL FEATURES, Optimized Light Engine, Advanced Picture with Digital Video, Noise Reduction, 25dB Ultra Quiet Fan, 5" LCD TFT Display, 0.8 Ratio Short Throw, Native contrast ratio: 40000:1, 250 Watt Ultra Bright Lamp, Color Temperature 9000K, Lamps Power: 250W/100,000 Hours, Nominal Impedance: 4-8 Ohms, DISPLAY TECH, Projector system: 8k laser tech Lamp, HDMI & Video Cable, Digital HDMI Projector, Brightness: 8000 Lumens.

15. The victim stated "Charlie" informed him that the projectors were very expensive, but he would be willing to give him a deal. He stated after negotiations between he and "Charlie", they agreed on the price of $800.00 for the Ennea E8k-8900 and a "Zero Edge Motorized Screen SI-72." The victim stated Charlie attempted to have him pay via a Cashapp with the phone number of 832-998-0923.

Investigative steps confirmed that this phone number was related to an account in the name of Rodney Clifton.

16. The victim stated that he decided to pay in cash, so "Charlie" and an additional unknown subject currently believed to be Cole Meadows inside the Ford Expedition followed him to the Bank of America located in O'Fallon, MO where the victim removed and provided $800.00 to "Charlie." "Charlie" in turn provided the victim with a receipt branded under the company name of "Sound Vision" detailing the sale of one Ennea Projector Television and one HD-72 Projection Screen 72" labeled Order #: NE51006150.

17. The victim stated that after he left the area, he conducted an internet search of the above stated projector and learned that the projector was likely fake. He stated he attempted to recontact "Charlie," but was unsuccessful. The victim stated he was scared that he was lied to resulting in him paying far too much money for a fraudulent product. The victim provided copies of the receipt of transaction, turned over the product, and a completed a written statement to OPD.

18. OPD Officer Frkovic conducted an internal computer check in reference to similar cases which resulted in identifying two similar OPD cases.

19. Both OPD cases involved conspirator Rodney CLIFTON approaching subjects in the parking lot of businesses and selling projectors. In one case, the reporting party had the projector professionally reviewed, resulting in a determination that the product was extremely low quality and retailed for around $150-200.

8

20. In response to Lograsso's report, on February 28, 2024, OPD Officer Frkovic conducted a review of the Flock cameras which revealed the suspect vehicle was still in the area of St. Louis County (Sunset Hills). OPD Officer Frkovic contacted O'Fallon communication officers and had them dispatch officers with the Sunset Hills Police Department in an attempted to locate the vehicle and potential suspects. The Sunset Hills Police Department was able to locate the vehicle and contacted OPD.

21. On February 28, 2024, OPD Detectives Nelson and Judge responded to the vehicle at 10760 Sunset Hills Plaza, Sunset Hills, MO. Detective Judge made contact with CLIFTON at the driver's side of the vehicle and placed CLIFTON under arrest for the state of Missouri charge of Stealing $750 or more. The passenger/co-conspirator was identified as Cole MEADOWS. The vehicle had numerous projectors and projection screens resting in the back seat and rear cargo area of the SUV. Detective Judge further observed the packaging for the A/V equipment to match the fraudulent projector and projection screen that was purchased by Lograsso.

22. The white Ford Expedition with Texas plates (TFN1340) was registered to Enterprise Holdings, LLC 14002 East 21st St Suite 1500 Tulsa, OK 74134. The vehicle was towed to Budget Towing pending a search warrant application. A black iPhone in a black pelican case was seized on CLIFTON's person incident to his arrest and has been maintained in police evidence pending this search warrant.

9

23. On February 29, 2024, OPD Detective Lohmeyer submitted a search warrant application to the St. Charles County Prosecuting Attorney's Office, Judge Sandcork authorized a search of the silver Ford Expedition TX/TFN1340. OPD recovered twelve (12) Ennea E8K-8900 8K Ultra HD Projectors, twelve (12) Zero Edge SI-72 motorized screen projector, (1) Samsung Android phone with black speck case S/N: R58W417EKKX, (1) Apple iPhone mini with black otter case, miscellaneous receipts, itemized Sound Vision receipts, and invoices for Sound Vision with payment methods documented.

24. On February 29, 2024, agents and detectives from TCSO, the Oklahoma Attorney General's Office, OPD , and HSI, conducted an interview with CLIFTON at OPD, O'Fallon, Missouri. In the recorded interview with CLIFTON, post Miranda and signing a Rights Waiver, CLIFTON admitted he was aware of the fraudulent nature of the projectors while performing the scam.

25. During the interview CLIFTON described selling the projectors as wholesaling and stated that he has been doing it for around twelve years. CLIFTON defined wholesaling as independently purchasing the low-quality projectors, or other electronic devices, from a warehouse to sell, or working for a business, called an "Office," and selling the devices that the Office provided.

26. CLIFTON also stated an Office was a company or business owned by an individual, whereby that individual would buy the devices from a warehouse, and several salespersons would work for the Office selling the devices it purchased. CLIFTON stated there were high-level people that were in charge of designing,

manufacturing, importing, and distributing the devices nation-wide. CLIFTON named several of those people: Larry, Nigel, LA Logistics, Canadian Eric, and Jack Amaroso, but stated there were many more that he could not name. CLIFTON stated these high-level people would all make different versions of the projectors, giving Offices and independent salespersons hundreds to choose from. CLIFTON stated these high-level people would inform the warehouses of the devices that they made and would pay the warehouses to hold their devices so independent salespersons and Offices could acquire them from the warehouse. CLIFTON stated the warehouses would even deliver the devices to the Offices because the Offices bought in such high quantities. CLIFTON stated that on top of the designing, manufacturing, importing, and distributing of devices, Larry also ran Offices in multiple cities and states in the United States.

27. CLIFTON said that he initially started working in one of the Offices but eventually graduated training and became a trainer for the Office. After working in the Office, CLIFTON opened his own business selling the projection devices. CLIFTON said he would sell the devices in any major city. CLIFTON resides in the Houston area, and the farthest he traveled west for sales was Salt Lake City, Utah; the farthest east was Charlotte, North Carolina; and the farthest north for sales was Fargo, North Dakota.

28. Concerning the fraudulent representations for the projection devices, CLIFTON stated all the devices have capabilities and specifications printed on the packaging and written on websites associated with the "brand" of the device.

CLIFTON stated you can find these websites by searching for them online, or by scanning a QR code on the box that takes you directly to the websites. CLIFTON gave an example of this with the "brand" of projector he was selling in February 2024 in Missouri. CLIFTON stated the "brand" was Ennea and you could go to EnneaProjectors.com to read a "write-up" on the projector and the screen that came with it. CLIFTON stated that along with the capabilities and specifications, the packaging and websites also had a MSRP for each device, which is hyper-inflated. CLIFTON stated that the hyper-inflated MSRP for the projectors ranges from $4,000 to $11,000. CLIFTON stated several times that he would show the victims the hyper-inflated MSRP for the devices, but he would tell them "MSRP don't mean nothing, that's just the suggested retail price," and that he could sell the projectors for whatever he wants to sell them for. When asked how CLIFTON convinces people they are buying a "high quality product," CLIFTON stated he relies on the website with the specifications and the "write-up," as well as plugging the device in to show them it works. CLIFTON describes what he does as "hustling," or "hustling on the street." CLIFTON stated he doesn't like that he has to hustle, and he claimed he and Joshua Frank made a plan to make as much money as possible selling projectors before moving on to a different line of work over the last three years.

29. TCSO Deputy Hirsch confronted CLIFTON about four specific dates whereon CLIFTON is believed to have sold fraudulent projectors in or Tulsa, Oklahoma: December 8th, 2021, December 22nd, 2021, January 4th, 2022, and

January 25th, 2022. Deputy Hirsch's conversation with CLIFTON about these instances elicited the following materially relevant responses:

    a. Deputy Hirsch asked CLIFTON if a victim wrote CLIFTON a check on January 25th, 2022, for the sale of a projector. CLIFTON admitted many of his victims write him checks. Deputy Hirsch asked if it would surprise him that he was written a check on that date and CLIFTON stated "No, absolutely not." CLIFTON explained that he normally would cash the check immediately in person if the victim's bank branch is close by but would also mobile deposit the check if no bank branches were available.

    b. Deputy Hirsch showed CLIFTON a copy of a check that was obtained by a search warrant concerning victim Robert Ward's bank account at Security Bank, written to "Rodney Clifton," with a memo line stating: "for Sound & Vision 8k laser screen & TV." CLIFTON admitted that the endorsement on the check was in fact CLIFTON's signature and that a series of letters and numbers written at the top of the check reflect his Texas driver's license number, birthday, and likely the expiration date of his driver's license.

    c. Deputy Hirsch informed CLIFTON that the evidence collected in the investigation appears to reflect a pattern of CLIFTON targeting males in nicer parts of town with nice pickup trucks. CLIFTON responded: "I

go for country guys, cause they're more safer. I don't go to the ghetto

and sell. I'll ask – co – country guys are more safer, so I'll ask them."

    d.  CLIFTON further acknowledged that he routinely split the proceeds of

the sales with others involved in the scheme and explained that it was

too difficult to estimate how much money he makes in any given period

of time but stated that $3,000 a week was a good week and that his best

week was around $4,500 in sales.

30. As noted above, League City Police Department previously obtained a search

warrant for a cellular phone in CLIFTON's possession in 2022. The forensic

downloads revealed evidence of the scheme to defraud victims through Oklahoma by

the sales of low-quality projectors, marketed as being high end. By CLIFTON's own

admissions and arrest in Missouri in February 2024, it is apparent that CLIFTON

had not stopped committing the fraud. Investigators believe it is probable that

evidence of the conspiracy to commit wire fraud and bank fraud will exist on the

DEVICES found in the possession of CLIFTON on his arrest in O'Fallon, Missouri.

Through CLIFTON's statements he said that sometimes when he received checks,

he would conduct a mobile deposit. The act of using mobile deposit relies on

someone endorsing the check, taking a photograph of the check, and uploading it to

bank accounts via cellular telephone.

31. The Devices are currently in the lawful possession of Homeland Security

Investigations (HSI) Seized Property Room, Tulsa, OK. They came into the

Homeland Security Investigations' possession in the following way: O'Fallon Police

Department executed a search warrant on the silver Ford Expedition TX/TFN1340

that CLIFTON was driving at the time of his arrest and seized (1) Samsung Android

phone with black speck case S/N: R58W417EKKX and (1) Apple iPhone mini with

black otter case. The third Device a black iPhone in a black pelican case was found

on CLIFTON's person and seized incident to his arrest and prior to his voluntary

interview. Due to CLIFTON's voluntary interview and expression of willingness to

further assist in law enforcement's investigation, OPD released CLIFTON on

February 29 without pressing criminal charges at that time, but retained the third

Device, a black iPhone in a black pelican case that was found on his person and then

sought and obtained the search warrant on the vehicle referenced herein that found

two additional Devices. On March 4, 2024, CLIFTON contacted OPD requesting

his phone be returned. In response, OPD put CLIFTON in touch with TCSO

Detective Hirsch who contacted CLIFTON. Detective Hirsch informed CLIFTON

that law enforcement understood CLIFTON desired to assist in the investigation and

that he would obtain an attorney to further advise him in that regard. Thereafter,

March 18, 2024, counsel representing CLIFTON contacted the U.S. Attorney's

Office in the Northern District of Oklahoma ("USAO"). I have been informed by the

USAO that they have communicated with CLIFTON's counsel, informed him about

the three phones and have since requested consent to search the phones along with

requested any relevant passcodes to access the Devices. As of the date of this

application, I have been informed that CLIFTON's counsel is still working with his

client on consent and passcodes, but none have yet been provided. Out of an

15

abundance of caution, this application is being submitted to seize and search the Devices.

32. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the O'Fallon Police Department O'Fallon, Missouri.

### Technical Terms

33. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on

personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very

17

large amounts of electronic data and may offer additional features such
as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to
display its current location. It often contains records the locations where
it has been. Some GPS navigation devices can give a user driving or
walking directions to another location. These devices can contain
records of the addresses or locations involved in such navigation. The
Global Positioning System (generally abbreviated "GPS") consists of 24
NAVSTAR satellites orbiting the Earth. Each satellite contains an
extremely accurate clock. Each satellite repeatedly transmits by radio a
mathematical representation of the current time, combined with a
special sequence of numbers. These signals are sent by radio, using
specifications that are publicly available. A GPS antenna on Earth can
receive those signals. When a GPS antenna receives signals from at
least four satellites, a computer connected to that antenna can
mathematically calculate the antenna's latitude, longitude, and
sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic
device used for storing data (such as names, addresses, appointments or
notes) and utilizing computer programs. Some PDAs also function as
wireless communication devices and are used to access the Internet and
send and receive e-mail. PDAs usually include a memory card or other

18

removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet

19

often cross state and international borders, even when the devices
communicating with each other are in the same state.

34. Based on my training, experience, and research, and from consulting the
manufacturer's advertisements and product technical specifications available online
at http://apple.com, I know that the Device has capabilities that allow it to serve as
a digital camera, portable media player, GPS navigation device, and PDA. In my
training and experience, examining data stored on devices of this type can uncover,
among other things, evidence that reveals or suggests who possessed or used the
device.

### Electronic Storage and Forensic Analysis

35. Based on my knowledge, training, and experience, I know that electronic
devices can store information for long periods of time. Similarly, things that have
been viewed via the Internet are typically stored for some period of time on the
device. This information can sometimes be recovered with forensics tools.

36. I know that cellular telephones are often equipped with digital cameras and
those phones possess the capability to transmit and/or store electronic images. I
know that in many cases, cellular telephones maintain photographs of illegal
activities, including bank fraud and wire fraud. These photos are sometimes stored in
their cellular phones and often are transmitted or sent from one electronic media
device to another. I also know that cellular phones may also contain notes regarding
potential illegal acts that are recorded by the subject who possesses the electronics.
Furthermore, I know that text messages and emails are often used by two or more

persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

37. I know that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Whatsapp" , "Facebook Messenger" and "GroupMe", individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done through the use of Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include bank fraud and wire fraud.

38. Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

39. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored

22

on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

18. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

19. *Methods of examination.* In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Device. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper

23

evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

## Conclusion

20. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

21. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

24

Respectfully submitted,

*Andrew Titsworth*

Andrew Titsworth
Task Force Officer
Homeland Security Investigations

Subscribed and sworn to by phone on April 19, 2024.

MARK T. STEELE
UNITED STATES MAGISTRATE JUDGE

25

## ATTACHMENT A

### Property to be Searched

The property to be searched is a **(1) Apple iPhone with black pelican case, (1) Samsung Android phone with black speck case,** serial number R58W417EKKX, **and (1) Apple iPhone mini with black otter case**, hereinafter the "Device." The Device is currently located at Homeland Security Investigations (HSI) Seized Property Room, Tulsa, OK.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

All records on the Device(s) described in Attachment A that relate to violations of

18 United States Code § 1343 (Wire Fraud) and 18 United States Code 1344 (Bank

Fraud), including:

1. Records relating to communication with others as to the criminal offenses
   listed above; including incoming and outgoing voice messages; text messages;
   emails; multimedia messages; applications that serve to allow parties to
   communicate; all call logs; secondary phone number accounts, including those
   derived from Skype, Line 2, Google Voice, and other applications that can
   assign roaming phone numbers; and other Internet-based communication
   media;

2. Records relating to documentation or memorialization of the criminal offenses
   listed above, including voice memos, photographs, videos, and other audio
   and video media, including Exchangeable Image File ("EXIF") data and any
   other metadata associated with those photos and videos, including device
   information, geotagging information, and information about the creation date
   of the audio and video media;

3. Records relating to the planning and execution of the criminal offenses above,
   including Internet activity, firewall logs, caches, browser history, and cookies,
   "bookmarked" or "favorite" web pages, search terms that the user entered into

any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

4. Application data relating to the criminal offenses listed above;

5. Threatening communications related to the criminal offenses listed above;

6. All bank records, checks, credit card bills, account information, and other financial records. Records relating to financial data or transactions, to include bank records, checks, credit card bills, account information, and other financial records, clientele lists, business associates, and diversification of wealth, United States Currency, any other electronically stored tangible items evidencing the obtaining, transfer, secreting, and/or concealment of assets and/or money, electronically stored records, documents, receipts, and/or negotiable instruments which evidence the purchase of negotiable instruments and/or the structuring of currency transactions to avoid the filing of currency transactions reports and/or the laundering of monetary instruments, electronically stored documents evidencing fruits, instrumentalities, monies, records, and notations, associated with the crimes listed above.

7. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

8. All records and information related to the geolocation of the Devices and travel in furtherance of the criminal offenses listed above; and

9. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. the government, attorney support staff, and technical experts.